IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

DAVID JOHNSON,
*Plaintiff*

v.

BALTIMORE POLICE DEPARTMENT
and BRIAN NADEAU,
*Defendants.*

C.A. No: ________________________

(Jury Trial Demanded)

**COMPLAINT**

Plaintiff David Johnson, by and through undersigned counsel, brings this Complaint against the Baltimore Police Department and Brian Nadeau, and alleges as follows:

**INTRODUCTION**

1. This is an action for money damages and equitable relief brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourteenth Amendment to the United States Constitution, against the Baltimore Police Department ("BPD") in its capacity as a municipal entity, and against Brian Nadeau ("Nadeau") in his individual capacity.

2. David Johnson is a Black detective who served the citizens of Baltimore for more than fifteen years. In 2023, BPD terminated him for allegedly misstating the time and place he clocked in on a single morning in November 2021 — a low-level timekeeping infraction that a supervisor and the assigned investigator initially recommended be resolved with, at most, a one-day suspension. Deputy Commissioner Nadeau and Captain Popp overrode that recommendation and drove the matter to termination.

3. At the same time BPD was ending Mr. Johnson's career over eighteen minutes of disputed time, it was extending leniency to white officers who committed far more serious misconduct. One white officer was suspended only a handful of days — later reduced further — after stealing money from a crime scene and destroying evidence. Mr. Johnson, by contrast, was given the Department's most severe sanction. The disparity was not accidental. It reflects both the personal racial animus of the officials who directed his case and a broader Departmental practice of disciplining Black officers more harshly than their white counterparts.

4. The manner in which Mr. Johnson was investigated and tried was also a product of a documented, Department-wide practice of weaponizing BPD's Public Integrity Bureau ("PIB"). That practice — of predetermining outcomes, disregarding the investigative protocols adopted under a federal consent decree, and denying accused officers a fair and impartial process — has been chronicled by the United States Department of Justice, by a commission established by the Maryland General Assembly, and by BPD's own former commander of internal affairs.

5. Mr. Johnson brings this action to redress the violation of his rights to equal protection of the laws and to due process of law, and to hold BPD accountable for the policies and customs that caused those violations.

## PARTIES

6. Plaintiff David Johnson is an adult Black/African American citizen of the United States and a resident of the State of Maryland. He was employed as a sworn member of the Baltimore Police Department from 2006 until his termination in 2023, most recently holding the rank of Detective assigned to the Group Violence Reduction Strategy unit.

7. Defendant Baltimore Police Department is a municipal entity and an agency organized under the laws of the State of Maryland with its principal place of business in Baltimore

City, Maryland. Although nominally a state agency under Maryland law, BPD operates as a municipal police force and is too interconnected with the government of the City of Baltimore to be an arm of the State. BPD is responsible for establishing, implementing, and enforcing the policies, practices, and customs governing policing in Baltimore, including the internal investigation and adjudication of officer misconduct. At all times relevant to this Complaint, BPD and its agents acted under color of state law. BPD is a "person" subject to suit under 42 U.S.C. § 1983.

8. Defendant Brian Nadeau, at all times relevant to this Complaint, was a Deputy Commissioner of BPD responsible for the oversight of the Public Integrity Bureau. Under BPD policy, only Deputy Commissioner Nadeau or his designee could make the final determination as to investigative findings in a PIB matter. Deputy Commissioner Nadeau made and directed decisions that shaped the investigation, charging, and disposition of the case against Mr. Johnson. He is sued in his individual capacity. At all relevant times he acted under color of state law.

**JURISDICTION AND VENUE**

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (a)(4) because it seeks redress for the deprivation, under color of state law, of rights secured by the Constitution and by Acts of Congress providing for the protection of civil rights, including 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any related claims arising under the laws and Constitution of the State of Maryland.

11. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant BPD resides in this District and because a substantial part of the events and omissions giving rise to the claims occurred in Baltimore City, Maryland. Assignment to the Northern

Division is proper because the events giving rise to the claims occurred in Baltimore City.

## FACTUAL ALLEGATIONS

### A. David Johnson's Service to the Baltimore Police Department

12. Mr. Johnson began his career in law enforcement in 2006 and became a sworn member of BPD. Over the course of more than fifteen years of service, he rose to the rank of Detective and was assigned to the Group Violence Reduction Strategy unit, work at the center of the City's public-safety efforts.

13. Before the events described below, Mr. Johnson had a limited disciplinary history consisting of two minor sustained matters, each resolved with a letter of reprimand. He had never been found to have engaged in dishonesty and had never been subjected to serious discipline.

14. Mr. Johnson took pride in his work and intended to complete his career as a Baltimore police officer.

### B. BPD's History of Misconduct and the Federal Consent Decree

15. BPD has a notorious history of officer misconduct and unconstitutional policing practices.

16. On April 7, 2017, BPD, the Mayor and City Council of Baltimore, and the United States Department of Justice entered into a Consent Decree aimed at addressing a pattern and practice of unconstitutional policing that had harmed the citizens of Baltimore for decades. Central to the reforms mandated by the Consent Decree was the premise that BPD must first effectively police itself through thorough, transparent, and fair internal investigations, while avoiding conflicts of interest in the conduct of those investigations.

17. The Public Integrity Bureau is the bureau within BPD tasked with investigating allegations of misconduct by BPD and its members.

18. As part of its efforts to comply with the mandated reforms, PIB adopted the PIB Internal Operations and Training Manual (the "PIB Manual"), which codified the reforms mandated by the Consent Decree. The PIB Manual was approved by the court overseeing the Consent Decree in November 2019 and was intended to ensure that every misconduct investigation is conducted comprehensively, fairly, and impartially.

19. The PIB Manual requires, among other things, that investigators thoroughly pursue all reasonable investigative leads, that investigative interviews be recorded and memorialized, and that investigations be conducted free of predetermined outcomes.

20. Under the PIB Manual, only Deputy Commissioner Nadeau or his designee could make the final determination as to investigative findings.

21. The Consent Decree and the PIB Manual established the standard of conduct to which BPD publicly committed, and against which the Department's treatment of Mr. Johnson must be measured.

### C. The Commission to Restore Trust in Policing and the Documented Culture of Corruption and Retaliation

22. In 2018, in response to BPD's long history of corruption and the public's deep-seated mistrust of the Department, the Maryland General Assembly established the Commission to Restore Trust in Policing (the "Commission").

23. The Commission undertook a two-year investigation into BPD, which included surveys and interviews of current and former members of the Department, in order to study the issue of corruption and to enact meaningful reform.

24. On December 2, 2020, the Commission published its findings in a report submitted to the Governor of Maryland, the Maryland Senate, and the House of Delegates. The

report included the results of a survey of approximately 2,800 active, sworn members of BPD conducted from August 11, 2020 through September 10, 2020.

25. The Commission's findings were stark. Of the officers who reported misconduct, approximately sixty-nine percent (69%) felt the matter was not handled properly, and more than half — approximately fifty-six percent (56%) — felt that they suffered negative consequences as a result of reporting. The Commission found that fear of retaliation is a powerful disincentive to reporting misconduct within BPD, and that officers feared being labeled a "rat" or a "snitch" and having their careers ruined if they came forward.

26. The Commission's report described a culture within BPD that is resistant to accountability and that tolerates and rewards retaliatory action against members who speak up.

27. The Consent Decree, the findings of the Commission, and the conduct described in this Complaint together establish a Department-wide policy and custom of conducting internal investigations in a manner that is neither fair, neutral, nor thorough, and of tolerating outcomes driven by considerations other than the evidence.

**D. The Weaponization of the Public Integrity Bureau**

28. Notwithstanding the reforms mandated by the Consent Decree, PIB was and is operated as an instrument to reach predetermined results rather than as a neutral investigative body.

29. Deputy Commissioner Nadeau made himself the final decision-maker on PIB cases and became personally and intricately involved in investigations that were of interest to him, routinely directing detectives on how to proceed, whom to interview, and what findings to reach.

30. On information and belief, Deputy Commissioner Nadeau directed PIB investigators to tailor their investigations and to recommend preordained findings consistent with his desired outcomes, particularly in high-profile ("Red Ball") matters, and directed that cases be evaluated under a standard below a preponderance of the evidence in order to reach his desired recommendations.

31. On information and belief, Deputy Commissioner Nadeau coerced and intimidated hearing officers assigned to the Office of Administrative Hearings to secure disciplinary recommendations consistent with his predetermined objectives.

32. BPD's former commander of internal affairs, who led the Bureau from February 2018 through April 2021, has attested that Deputy Commissioner Nadeau dismantled internal accountability processes, micromanaged and pressured investigators, installed technology enabling him to monitor detective interviews and administrative hearings in real time and to direct questioning, and created a hostile and retaliatory environment within PIB. She has further attested that Deputy Commissioner Nadeau directed Lieutenant (now Captain) Popp to carry out improper directives and that Popp deferred to Nadeau on Bureau decisions. Lansey Aff. 3-5, attached hereto as Ex. A.

33. That same former commander has attested that, during a command-staff meeting, Deputy Commissioner Nadeau referred to two Black men who had come to report police corruption in demeaning, racially charged terms — conduct that, together with other facts alleged herein, reflects racial animus on the part of the official who controlled Mr. Johnson's case. *Id*.

34. On information and belief, Deputy Commissioner Nadeau harbors racial animus toward Black officers, and that animus was a motivating factor in the treatment of Mr. Johnson.

35. The practices described above were not isolated. They reflect a persistent and widespread custom within BPD, known to and tolerated by the Department's

policymakers, of weaponizing the investigative and disciplinary process to reach predetermined results.

**E. The November 2021 Timekeeping Incident, the PIB Investigation, and the Continuing Course of Conduct by the Defendants**

36. On November 3, 2021, Mr. Johnson was scheduled to work an 8:00 a.m. to 4:00 p.m. shift. At approximately 8:06 a.m., he telephoned his supervisor to advise that he had left his wallet at home, and the supervisor permitted him to retrieve it. Mr. Johnson clocked in through the Department's Workday timekeeping system at 7:59 a.m. and arrived in the parking lot of his assigned building, after leaving with the permission of his supervisor to locate his wallet, at approximately 8:18 a.m.

37. When his supervisor asked where he had been when he clocked in, Mr. Johnson gave an account of his location that the supervisor questioned. The entire matter concerned a discrepancy of a few minutes of time on a single morning.

38. The supervisor submitted an internal complaint, and the matter was referred to PIB for investigation on or about November 9, 2021.

39. The case was assigned to Detective DeShawn Serrano as the primary investigator, under the supervision of then-Lieutenant Popp. The relevant building surveillance footage was retained for only fifteen days and had been automatically deleted before the case was assigned, so no video of the incident was ever available to the investigation.

40. The investigator and Mr. Johnson's own supervisor initially viewed the matter as minor. The supervisor's recommendation, consistent with BPD's progressive-discipline framework and Mr. Johnson's limited history, was for discipline of, at most, a single day without pay.

41. Deputy Commissioner Nadeau and Captain Popp rejected that recommendation and directed that the matter proceed as a charge of making a false statement — an offense that, if sustained, carried termination.

42. On or about July 5, 2022, Detective Serrano prepared a six-page investigative report. Captain Popp reviewed, approved, signed, and "sustained" the report's allegations of false statement/untruthfulness against Mr. Johnson.

43. On September 22, 2022, BPD charged Mr. Johnson with making a false statement in violation of departmental policy.

44. The elevation of a minor timekeeping discrepancy into a termination-level dishonesty charge was inconsistent with the treatment of comparably or more seriously situated white officers and was driven by the improper considerations described in this Complaint.

**F. The Administrative Trial Board and the Denial of a Fair Process**

45. Mr. Johnson elected to contest the charge before an administrative trial board.

46. The primary investigator, Detective Serrano — the only witness with firsthand knowledge of the investigation and its findings — did not appear at the hearing.

47. Mr. Johnson timely requested an administrative subpoena to compel Detective Serrano's appearance, and when Detective Serrano failed to appear, Mr. Johnson requested that the Board apply for a judicial subpoena to compel his attendance so that he could be cross-examined about the report and its findings. The Board and BPD declined to secure Detective Serrano's testimony.

48. In place of the investigator with firsthand knowledge, BPD called Captain Popp, who had no independent recollection of the underlying facts and who testified by reading from Detective Serrano's notes and report. Mr. Johnson's counsel lodged a continuing

objection, and the record reflects that Captain Popp lacked firsthand knowledge of the matters to which he testified.

49. As a result, Mr. Johnson was denied a meaningful opportunity to confront and cross-examine the individual whose investigation formed the basis of the charge against him. Mr. Johnson was unable to inquire about how the disciplinary recommendation was made, how the matter transformed from a minor infraction into a terminable offense, and any input Captain Popp and Deputy Commissioner Nadeau had on that process.

50. On information and belief, the trial board was not composed of the number of members required by applicable procedure.

51. On information and belief, Deputy Commissioner Nadeau exerted pressure on the trial-board process to ensure a finding of guilt and a recommendation of termination.

52. The trial board found Mr. Johnson guilty of making a false statement.

53. Because the sustained charge was one of false statement, the disposition carried termination.

**G. Termination**

54. On August 24, 2023, BPD terminated Mr. Johnson's employment.

55. The public charge that Mr. Johnson had made a false statement — a charge of dishonesty — was made in conjunction with his termination and has stigmatized his reputation and impaired his ability to obtain comparable employment in law enforcement.

**H. State Judicial Review**

56. Mr. Johnson sought judicial review of the Board's decision in the Circuit Court for Baltimore City, Case No. 24-C-23-003913.

57. On or about November 22, 2024, the Circuit Court reversed the Board's findings and ordered that Mr. Johnson be reinstated to his position with full back pay and benefits from the date of his termination, concluding that he had been denied due process.

58. Despite that order, BPD did not reinstate Mr. Johnson, restore him to payroll, or make him whole.

59. On February 11, 2025, the Circuit Court denied BPD's post-judgment motion and again directed that Mr. Johnson be reinstated.

60. BPD again declined to reinstate Mr. Johnson and instead noted an appeal to the Appellate Court of Maryland (Case No. ACM-REG-2481-2024).

61. On May 18, 2026, the Appellate Court of Maryland, in an unreported opinion, reversed the Circuit Court's judgment and remanded with instructions to affirm the Board's decision, holding that the Board did not abuse its discretion in declining to compel Detective Serrano's attendance, that the Board did not err in admitting the investigative evidence through Captain Popp, and that the Board's findings were supported by substantial evidence.

62. The Appellate Court's decision resolved the questions of Maryland administrative and evidentiary law presented on the state record. It did not adjudicate, and Mr. Johnson did not litigate in the state proceedings, his federal claims that BPD and Defendant Nadeau discriminated against him on the basis of race in violation of the Equal Protection Clause, or that the Department's policies and customs caused the deprivation of his federal constitutional rights.

63. The evidence at the center of this action — that Deputy Commissioner Nadeau personally manipulated BPD's investigative and adjudicative processes to reach predetermined outcomes, including by directing investigators to reach preordained findings, coercing and pressuring hearing officers and trial-board members, and

installing and using technology to monitor and direct interviews and hearings in real time — was not presented to, developed before, or considered by the Maryland courts, whose review was confined to the closed administrative record and to the narrow questions of Maryland administrative and evidentiary law framed by that record.

64. Because Deputy Commissioner Nadeau's interference was concealed and lay outside the administrative record, Mr. Johnson did not have a full and fair opportunity in the state proceedings to litigate the true, non-neutral character of the process to which he was subjected. The Maryland courts did not adjudicate whether Deputy Commissioner Nadeau's interference deprived Mr. Johnson of a neutral and impartial tribunal, or whether the denial of his request to confront and cross-examine the primary investigator operated to conceal that interference.

65. The Appellate Court's affirmance rested on independent, alternative grounds, including its determination that the Board's finding was supported by substantial evidence apart from the investigative report and Captain Popp's testimony; the Appellate Court's evidentiary rulings were therefore not necessary to its judgment.

66. Throughout the state proceedings, BPD's leadership refused to entertain resolution of Mr. Johnson's case on terms that would have made him whole, and made clear its determination to keep Mr. Johnson out of the Department.

67. Mr. Johnson's Trial Board consisted of 3 sworn BPD officers and one civilian. All 3 BPD officers received promotions following their participation on the Trial Board: [then] Major Guy Thacker was promoted to Lieutenant Colonel; [then] Sgt. Horace McGriff was promoted to Lieutenant; [then] Officer Bruce Dahiti was promoted to Sgt. Additionally, BPD's key witness, [then] Sgt. Jennifer Cox, was promoted to the rank of Lieutenant and further promoted to the rank of Captain following her participation in the Trial Board proceedings.

## I. Disparate Treatment of Similarly Situated White Officers

68. At the same time BPD was pursuing Mr. Johnson's termination for a disputed timekeeping entry, it was extending leniency to white officers who engaged in misconduct of far greater seriousness.

69. Contemporaneously with the recommendation to terminate Mr. Johnson, a white BPD officer received a suspension of only a few days — later reduced further — after stealing money from a crime scene and destroying evidence by flushing suspected narcotics. That officer's conduct went to the core of law-enforcement integrity, yet it was treated as a minor matter, while Mr. Johnson's disputed account of a few minutes of time was treated as a terminable act of dishonesty.

70. On information and belief, other white BPD officers accused of comparable or more serious misconduct — including conduct bearing directly on honesty and integrity — were permitted to retain their positions, received minor discipline, or were allowed to resign or retire rather than being terminated.

71. In or about October 2025, a white BPD officer, Robert A. Parks, was captured on video using his marked patrol vehicle to pursue a fleeing civilian — driving onto a sidewalk and across a grassy field before crashing into a fence — and was criminally charged and convicted of second-degree assault, three counts of misconduct in office, and reckless driving. Officer Parks's personnel file reflected nearly a dozen additional complaints or infractions that had prompted internal investigations during his approximately five-year tenure with BPD. Upon information and belief, and in stark contrast to the termination BPD imposed on Mr. Johnson for a disputed timekeeping entry, Officer Parks was not terminated by BPD for this far more serious, integrity-related misconduct.

72. Mr. Johnson's alleged conduct was comparable in seriousness to, or less serious than, the misconduct of these white comparators, yet the discipline imposed on him was materially more severe.

73. The disparity in treatment cannot be explained on any ground other than race. It is consistent with a broader pattern in which Black officers within BPD are disciplined more severely, and afforded fewer second chances, than their white counterparts.

74. The race of Mr. Johnson was a motivating factor in the decision to charge him with a termination-level offense, in the conduct of the proceedings against him, and in the decision to terminate his employment.

### J. Injury and Damages

75. As a direct and proximate result of the Defendants' conduct, Mr. Johnson lost his position, his sworn status, his salary, and his employment benefits, his pension, and has suffered continuing economic loss.

76. Since March 2025, Mr. Johnson has been compelled to accept substantially inferior employment in private security at a fraction of his former compensation, without the benefits, pension accrual, or professional standing of a sworn officer.

77. Mr. Johnson has suffered damage to his professional reputation, the foreclosure of opportunities in his chosen field, and significant emotional distress, including anxiety, humiliation, and related harm.

78. Defendant Nadeau acted intentionally, willfully, and with reckless or callous disregard for Mr. Johnson's federally protected rights.

## CLAIMS FOR RELIEF

### COUNT I
### 42 U.S.C. § 1983: Denial of Equal Protection (Fourteenth Amendment) (Against Defendant Nadeau)

79. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

80. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally treating similarly situated persons differently on the basis of race.

81. Mr. Johnson is a member of a protected class. He performed his duties satisfactorily and was subjected to adverse action — the elevation of his charge to a termination-level offense and his resulting termination — under circumstances giving rise to an inference of unlawful race discrimination.

82. Similarly situated white officers, whose misconduct was comparable in seriousness to or more serious than Mr. Johnson's alleged conduct, were treated more favorably and were not terminated.

83. Acting under color of state law, Defendant Nadeau intentionally discriminated against Mr. Johnson because of his race. Race was a motivating factor in his decisions to pursue, sustain, and effectuate a termination-level charge against him.

84. As a direct and proximate result, Mr. Johnson suffered the injuries and damages described above.

**COUNT II**
**42 U.S.C § 1983: Denial of Procedural Due Process – Property and Liberty Interests (Fourteenth Amendment) (Against Defendant Nadeau)**

85. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

86. As a sworn officer removable only for cause, Mr. Johnson possessed a constitutionally protected property interest in his continued employment, of which he could not be deprived without due process of law.

87. Due process further guaranteed Mr. Johnson a neutral and impartial decision-maker and a fundamentally fair adjudication, free of a predetermined outcome. Deputy Commissioner

Nadeau deprived him of that guarantee by directing and pressuring the investigation and the trial-board process to reach a preordained result, and by causing the denial of Mr. Johnson's request to confront and cross-examine the primary investigator — a denial that both impaired his defense and concealed Deputy Commissioner Nadeau's interference in the process.

88. Mr. Johnson also possessed a constitutionally protected liberty interest in his good name, reputation, and freedom to pursue his chosen occupation. BPD's public charge that Mr. Johnson had made a false statement — a charge that imputes dishonesty and serious character defect, that was false, and that was made in conjunction with his termination — implicated that liberty interest and entitled him to a meaningful opportunity to clear his name. The false-statement finding is recorded in Mr. Johnson's personnel and disciplinary records, which BPD releases or makes available to prospective law-enforcement employers and reports to law-enforcement certification and hiring authorities. Mr. Johnson has sought, and intends to continue to seek, comparable employment in law enforcement, and prospective employers are likely to request and inspect those records and to encounter the stigmatizing false-statement finding. BPD afforded Mr. Johnson no meaningful opportunity, at a meaningful time, to clear his name.

89. Acting under color of state law, Defendant Nadeau deprived Mr. Johnson of these interests without constitutionally adequate process, including by engineering a termination-level charge for improper reasons and by denying him a fair and impartial adjudication — most significantly, the opportunity to confront and cross-examine the investigator whose findings formed the basis of the charge against him.

90. The determinations of the Appellate Court of Maryland do not preclude this claim. Mr. Johnson did not have a full and fair opportunity to litigate the manipulated, non-neutral character of the disciplinary process; the facts of Deputy Commissioner Nadeau's interference were concealed and were not before the Maryland courts; and the Appellate Court's evidentiary rulings were not necessary to its judgment, which rested independently on its determination that substantial evidence supported the Board's finding.

91. As a direct and proximate result, Mr. Johnson suffered the injuries and damages described above.

**COUNT III**
**42 U.S.C. § 1983: Municipal Liability (Against Defendant Baltimore Police Department)**

92. Plaintiff incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

93. At all times relevant to this Complaint, BPD maintained policies, practices, and customs exhibiting deliberate indifference to the constitutional rights of its officers, including (a) a persistent and widespread custom of conducting internal investigations and disciplinary proceedings in a manner that is neither fair, neutral, nor thorough, and of directing predetermined outcomes through the Public Integrity Bureau; (b) a persistent and widespread custom of interfering with the Trial Board process in a manner designed to prevent a fair and impartial evaluation of the facts and instead to deliver a pre-ordained result; and (c) a persistent and widespread custom of disciplining Black officers more severely than similarly situated white officers.

94. Deputy Commissioner Nadeau held, under the PIB Manual and BPD policy, final authority to determine investigative findings within PIB, and the Police Commissioner delegated to him final decision-making authority over the conduct of internal investigations within the Public Integrity Bureau. He was therefore a final policymaker of BPD with respect to internal-investigation policy, and his acts and directives in that capacity represented the official policy of BPD.

95. The existence of these policies and customs, and BPD's deliberate indifference to them, is evidenced by the Consent Decree entered into to remedy a pattern and practice of unconstitutional conduct, by the findings of the Commission to Restore Trust in Policing documenting a pervasive culture of retaliation and resistance to accountability, and by the pattern of conduct described in this Complaint.

96. The Commission to Restore Trust in Policing documented that BPD had a systemic failure to discipline officers for misconduct even in cases of repeated or egregious violations, and an internal culture resistant to corrective discipline in which officers feared retaliation for reporting misconduct. The Commission found that BPD's Internal Affairs function was ineffective and under-resourced and that integrity-reinforcement efforts were treated as afterthoughts.

97. The Commission further documented specific instances in which BPD officers who were the subject of numerous citizen complaints faced little or no repercussions, and in which officers remained in good standing or were even promoted after Internal Affairs knew of their misconduct, including an officer who was promoted and placed in charge of a plainclothes unit despite numerous red flags. These findings, together with the disparate treatment of the white officers described above, reflect a disciplinary system that BPD's policymakers knew to be arbitrary, non-neutral, and administered without regard to the comparative seriousness of the underlying conduct.

98. By entering into the 2017 federal Consent Decree, and through the findings of the Commission, BPD's policymakers had actual and constructive knowledge of a pattern and practice of unconstitutional conduct and of the need for fair, neutral, and thorough internal investigations, yet failed to correct the policies, practices, and customs that caused the deprivation of Mr. Johnson's rights.

99. BPD's policymakers had actual or constructive knowledge of these persistent and widespread practices and, through their deliberate indifference, failed to correct them.

100. These policies and customs were the moving force behind, and directly and proximately caused, the deprivation of Mr. Johnson's rights to equal protection and due process, and the resulting injuries and damages described above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff David Johnson respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

A. Compensatory damages in an amount to be determined at trial, including back pay, front pay, lost benefits, and lost pension value, together with damages for emotional distress and reputational harm;

B. Punitive damages against Defendant Nadeau in his individual capacity;

C. Equitable relief, including reinstatement or front pay in lieu thereof, a name-clearing hearing, and expungement of the false-statement finding and related adverse records from Mr. Johnson's personnel file;

D. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

E. Pre-judgment and post-judgment interest as permitted by law; and

F. Such other and further relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a jury trial on all triable issues of fact raised by this Complaint.

Dated: August 21, 2026

Respectfully submitted
THE PLAINTIFF,

By */s/ Patrick Jennings*

Patrick Jennings, Esq. (30362)
Ment Law Group
225 Asylum Street – 15th Floor
Hartford, CT 06103
pjennings@mentlaw.com

Michael Turiello, Esq. (30383)
Skeen Law Offices
258 E. High Street
Charlottesville, VA 22902
mturiello@skeenlaw.com

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
NORTHERN DIVISION

JEFFREY LILLY, *et al.*,
Plaintiffs,

vs.

BALTIMORE POLICE DEPARTMENT, *et al.*,

Defendants

C.A. No.: 1:22-cv-02752-BAH

**AFFIDAVIT OF STEPHANIE LANSEY**

**STATE OF MARYLAND**

**HOWARD COUNTY**

I, Stephanie Lansey, being first duly sworn, depose and state as follows:

1. **Personal Background**

I am over the age of eighteen and am competent to testify to the matters stated herein.

I am a former police officer with the Baltimore City Police Department. From February 2018 until April of 2021, I was the Major of Internal Affairs – which was renamed to Public Integrity Bureau while I was the commanding officer.

At all times while I was the Major of PIB, the Baltimore Police Department was under a consent decree.

In my capacity as the Major of the Public Integrity Bureau I interacted with Deputy Commissioner Brian Nadeau and [then] Lieutenant Daniel Popp on a near daily basis.

2. **<u>My Interactions with Deputy Commissioner Brian Nadeau and Daniel Popp</u>**

Brian Nadeau made himself the final decision maker on all cases at PIB. Brian Nadeau was intricately involved in most investigations and routinely micro-managed Detectives, Sergeants, Lieutenants and Captains.

While I was the Major, Deputy Commissioner Brian Nadeau strategically cut me out of the decision making as he felt I was too hard on the cases/detectives and demanded too much outside of their current investigative skills.

When Brian Nadeau arrived at PIB, weekly meetings named IA Stat were an important tool for holding the detectives accountable to timelines. IA Stat was attended by all the gold badges (supervisors) in the building and the detectives for investigation review. Shortly after his arrival, Deputy Commissioner Nadeau cut this important process out because he felt the detectives disliked it and he wanted to make them happy. Deputy Commissioner Nadeau clearly explained that this was a necessary step because many of the detectives had little to no investigative skills and really did not know how to start or investigate a case.

Rather than hold the detectives accountable, or teach them how to properly investigate cases, Brian Nadeau forged personal relationships with the detectives where he would go out to their desks and work with them on cases he had taken an interest in.

Brian Nadeau silenced me during our time at PIB as he felt I would never help the agency succeed in the eyes of the Department of Justice. I did not believe the 90-day process of case completion mandated under the consent decree was feasible. At that time, we were completing investigations in 365 days and detectives were holding cases until 350 days and then attempting to rush an investigation. Without other changes, insisting on a 90-day time period would only shorten the timeframe detectives had to complete an accurate and efficient investigation.

Sadly, the sergeants and lieutenants in PIB were also not adequately reviewing cases. I voiced my concerns about their deficiencies to Deputy Commissioner Nadeau, and I instituted a process where all cases with a finding of 'not sustained' had additional supervisory review by Lieutenant Jason Yerg. This process consistently identified cases in which a clear violation of agency policies occurred, yet the result of the investigation was 'not sustained.' Deputy Commissioner Nadeau stopped this process.

On one occasion, Brian Nadeau directed Daniel Popp to illegally serve discipline on an officer. Lieutenant Yerg was reviewing cases and found a case that Lieutenant Popp had allowed to move beyond its expiration date. The case was brought to my attention, and my rule was that when any case expired (meaning the investigative deadline was missed) the entire chain of command involved in that case would be charged. I took the case into Deputy Commissioner Nadeau's office, and he called in Lieutenant Popp. They discussed that they would solve the matter without charges. Deputy Commissioner Nadeau instructed Lieutenant Popp to go out and meet the accused officer and convince the officer to accept discipline. In this effort, Lieutenant Popp worked beyond his shift at the direction of Deputy Commissioner Nadeau. Lieutenant Popp then brought me an overtime slip which I refused to sign because I did not give the unlawful order or direction to clean up this matter.

When Deputy Commissioner Nadeau had an issue with an officer, he became personally involved in the investigation of that officer. One such example is the case of Natalie Preston which I recused myself from due to the close working relationship I had with Preston in the past. Deputy Commissioner Nadeau was extremely involved throughout the investigation and controlled the direction of the case. Another example was the case of John Fernandez and Timika Dyson Nadeau had plans to get Fernandez promoted and retained at PIB so he instructed the

accused to be separated and Fernandez's case worked swiftly and closed while Dyson's case was farmed out to an outside agency to be investigated due to her PIB assignment and close working relationship which Fernandez also had. Dyson's case was not closed until 2024.

Brian Nadeau routinely utilized discrete scare tactics to influence investigations and manipulate the outcomes of investigative hearings. One such tactic was sitting through the administrative hearings and/or wanting updates brought to him by Detective Lisa Riha. Detective Riha worked in the Office of Administrative Hearings and had a one-on-one relationship with Nadeau even though she had a personal chain of command she was expected to follow.

When Deputy Commissioner Nadeau arrived in PIB he took extraordinary steps to install technology which would allow him to watch, in real time, the investigative hearings and the detective interviews which occurred in the building. If there was an investigation he was interested in, Deputy Commissioner Nadeau would watch the detectives' interviews live from his office and then send down notes or go directly to the interview room to assist with questions he would like asked. Captain John Fernandez and Lieutenant Daniel Popp would also sit and watch the interviews with him.

Brian Nadeau routinely had detectives in his office providing him a step-by-step accounting on what they were doing on investigations. Deputy Commissioner Nadeau would clearly communicate where he would like them to take the investigation next (who and who not to interview).

3. **<u>Brian Nadeau and Daniel Popp's Relationship</u>**

Brain Nadeau and Daniel Popp are extremely close. Daniel Popp invited Brian Nadeau to his Florida destination wedding. Daniel Popp did not move without running all things by Brian

Nadeau because he was too afraid to make decisions on his own, particularly when those decisions could upset Deputy Commissioner Nadeau. I witnessed this scenario play out throughout my time in PIB.

4. **My Departure from the Public Integrity Bureau and the Baltimore Police Department**

I left PIB to take a Major position within a district because I am not a person who can live in the gray. PIB cases are black and white and should stay that way. All cases should be handled with an unbiased eye and taken seriously, as a decision could change a person's livelihood drastically. Cases should not be rushed, and all "rocks" should be overturned to prove guilt/innocence. I do not believe in playing favorites and would always recuse myself if any idea of impartial feelings could be introduced. I read the policy and follow the steps. I do not bend the policies for friends or for anyone that others may not want to see disciplined.

Towards the end of my time in PIB I was beginning to see way too much of the 'gray' activity at PIB and was very uncomfortable with the staff that was being brought there, and the hostile and retaliatory environment Brian Nadeau had created.

During a Command Staff Meeting, Brian Nadeau observed two African American males walking across the parking lot and said to me "look at those mopes coming in here." I asked what he meant by the language used to which he could not reply. I was extremely disturbed by the terminology he used, especially since the use could not be explained. I went out and met with the two males who were business owners reporting police corruption. I spoke with the Police Commissioner and his Chief of Staff about my concerns. They asked me what I wanted to do. I advised I wanted out of PIB, and I was then granted a transfer to the Eastern District as the

Major. The Police Commissioner and his Chief of Staff advised Deputy Commissioner Nadeau that I had reported him, and Brian Nadeau became very upset about this and called me into his office. His communication to me was very unprofessional. At this point I knew the agency was quickly shifting to a place I no longer belonged, and I retired approximately 14 months later.

5. **My Testimony**

My testimony is relevant to this case because I have become aware of litigation calling into questions the actions of Deputy Commissioner Nadeau as well as current and former members of the Public Integrity Bureau. The allegations I have been made aware of are consistent with the personal and professional observations from my time as the Major of the Public Integrity Bureau.

I am willing to testify truthfully to these facts in court. I make this statement freely and voluntarily. I have not been pressured, threatened, coerced, or otherwise induced to make these statements.

6. **Conclusion**

I declare under penalty of perjury under the laws of the State of Maryland that the foregoing is true and correct to the best of my knowledge and belief.

**FURTHER AFFIANT SAYETH NOT.**

Stephanie C. L.

**[Signature of Affiant]**

Stephanie Lansey

February 15, 2025

---

**NOTARY BLOCK (State of Maryland)**

**STATE OF MARYLAND**

**HOWARD COUNTY**

On this 15th day of February, 2025, before me, the undersigned Notary Public, personally appeared Stephanie Lansey, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged that he/she executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

---

**Notary Public Signature** Anthony C. Rulli

[Printed Name of Notary Public] Anthony C. Rulli

Notary Public, State of Maryland

My Commission Expires: July 28, 2027

**[Notarial Seal]**

ANTHONY C RULLI
NOTARY PUBLIC
ANNE ARUNDEL COUNTY
MARYLAND
MY COMMISSION EXPIRES JULY 28 2027